United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

**No. 22-1264**

**September Term, 2022**

FILED ON: JUNE 23, 2023

XCEL PROTECTIVE SERVICES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

————

Consolidated with 22-1295 ———

On Petition for Review and Cross-Application for Enforcement
of Orders of the National Labor Relations Board

———

Before: KATSAS, RAO, and PAN, *Circuit Judges*.

## J U D G M E N T

These consolidated cases were considered on the record from the National Labor Relations Board and on the briefs and arguments of the parties. The Court has accorded the issues full consideration and determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). For the reasons stated below, it is:

**ORDERED** that the petition for review filed by Xcel Protective Services, Inc., is **DENIED** and that the National Labor Relations Board's Cross-Application for Enforcement is **GRANTED**.

\* \* \*

Xcel Protective Services, Inc. ("Xcel") had a contract with the U.S. Navy to provide security services at the Navy's facility on Indian Island, located near Seattle, Washington. Mark Salopek, an Xcel employee who worked as a security guard at Indian Island, reported safety concerns to the Navy. Xcel fired him. An administrative law judge ("ALJ") concluded that Xcel violated § 8(a)(1) of the National Labor Relations Act by terminating Salopek for engaging in protected conduct, and the National Labor Relations Board (the "Board") affirmed. Xcel petitions for review of the Board's decision, and the Board cross-petitions for enforcement of its order. We

lack jurisdiction to review many of Xcel's claims because the company did not raise them before the Board. As for the exceptions that Xcel did not forfeit, the Board's conclusions are amply supported by substantial evidence. Accordingly, we deny Xcel's petition and grant the Board's cross-petition.

## I.

Naval Magazine Indian Island is a deep-water ammunitions port near Seattle, Washington. The Navy hired Xcel to "staff key checkpoints" and "conduct roving patrols" to maintain security at Indian Island. ALJ Op. 3. The Navy required Xcel's guards to pass shooting tests every six months, "at specific shooting ranges approved by the Navy, using only [targets,] government-owned weapons, and ammunition provided by the Navy." ALJ Op. 5; *see also* Hr'g Tr. 53–54, 104–05, 893. Xcel's guards had two opportunities to pass their shooting qualification tests. *See* ALJ Op. 6; Hr'g Tr. 657–58. If a guard failed both tests, "the guard was supposed to be removed from the contract." ALJ Op. 6; *see also* Hr'g Tr. 657–58. Although the Navy set the qualification standards, Xcel employees administered the shooting tests. *See* ALJ Op. 6; Hr'g Tr. 121.

Beginning in 2016, Salopek learned that Xcel was violating Navy protocols by "using alternative sites, not authorized by the Navy, for weapon qualifications," and by allowing Xcel guards to use firearms for the qualifications that were not issued by the Navy. ALJ Op. 9; Hr'g Tr. 105–09. For example, Salopek learned that one Xcel employee had tried to qualify two guards at an unauthorized location — a "gravel pit/rock slab" — using a privately-owned AR-15 rifle, rather than a Navy-provided M-4 rifle. ALJ Op. 11; *see also* Hr'g Tr. 108–09, 126–27; Xcel Ex. 1 at 2. Salopek also witnessed three guards fail their rifle qualification tests before another Xcel employee "dr[ew] a large black cross on each target with a marker" to help the guards see their targets. ALJ Op. 9; *see also* Hr'g Tr. 110–11.

Salopek raised concerns about the unauthorized qualification sites, private weapons, and altered targets to Xcel's then-CEO, John Morgan. *See* ALJ Op. 13–14; Gen. Counsel Ex. 3. Among other concerns, Salopek told Morgan that "someone could get hurt and the company could potentially be liable" and that "guards might be unable to handle their weapons properly, or fire them accurately, if there was a critical incident on the base." ALJ Op. 13; *see also* Gen. Counsel Ex. 3 at 5.

Dissatisfied with Morgan's response, Salopek and two other guards — Daniel Lein and Steve Mullen — decided to alert the Navy. They "went to see the base commander" at Indian Island and "ask[ed] if they could speak with him about a safety concern." ALJ Op. 14–15; *see also* Hr'g Tr. 160–63. The commander "asked if they had reported the issue up [Xcel's] chain of command, and they said yes." ALJ Op. 15; *see also* Hr'g Tr. 687. Upon hearing about the alleged safety problems, the commander instructed Salopek and the other two guards to send an email detailing the issues to the Navy's Installation Security Officer for Indian Island, which they did. *See* ALJ Op. 15; Hr'g Tr. 463–65. After receiving the email, the Installation Security Officer notified Xcel that he was removing from duty the five guards identified as having participated in unauthorized or improper qualification shoots. *See* ALJ Op. 16–17; J.A. 160 (Installation Security Officer's email to Xcel).

A few hours after the Installation Security Officer contacted Xcel, Mullen overheard Morgan say that Mullen and Salopek "are a cancer" and that Lein, who was a probationary employee, would be "easy to get rid of." ALJ Op. 18; Hr'g Tr. 467. On the following day, Lein "received a telephone call from [Michael] Terry," the head of Xcel's operations at Indian Island, who said "that he was pulling [Lein] off his post and off the contract" and that Lein "had made a big mistake." ALJ Op. 17; *see also* Hr'g Tr. 725.

The Navy undertook an investigation of Salopek's allegations, which was led by civilian employee Richard Rake. *See* ALJ Op. 23; Hr'g Tr. 589. Rake recommended that the Navy prohibit Xcel's guards from standing post "until 100% weapons qualifications are completed." ALJ Op. 31–33; Xcel Ex. 2 at 5. He did not recommend any other action against Xcel for the alleged safety violations, characterizing the allegations as "he said, she said, I heard, no names." ALJ Op. 31; Xcel Ex. 2 at 2. Rake recommended, however, that Xcel remove Salopek from the Indian Island contract for relying on "hearsay comments" in his complaint, showing a "disregard for Navy policy," and lacking "integrity, ability, and good character." ALJ Op. 34; Xcel Ex. 2 at 11. Neither Rake nor his superior "made any recommendation whatsoever as to whether Xcel should terminate Salopek." ALJ Op. 37; *see also* Hr'g Tr. 558–59. Nevertheless, shortly after Rake and his superior met with the new CEO of Xcel, Michael Filibeck, the company fired Salopek. *See* ALJ Op. 38–39; Hr'g Tr. 202.

Following Salopek's dismissal, the Board's General Counsel charged Xcel with violating § 8(a)(1), (3), and (5) of the National Labor Relations Act ("NLRA"). Among other allegations, the Board's General Counsel asserted that Xcel had unlawfully fired Salopek for engaging in protected concerted activity. *See* ALJ Op. 1; Gen. Counsel Ex. 1(bbb) at 5; Gen. Counsel Ex. 1(d). ALJ John Giannopoulos conducted a six-day trial and issued a thorough opinion concluding, among other things, that Xcel unlawfully terminated Salopek. *See* ALJ Op. 50–55, 60. A three-member Board panel affirmed, with one member dissenting in part. *See Xcel Protective Servs., Inc.*, 371 N.L.R.B. No. 134 (Sept. 8, 2022) ("Board Op."). Xcel timely petitioned for review of the Board's decision. The Board filed a cross-application for enforcement.[1]

## II.

We must uphold "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence." 29 U.S.C. § 160(e). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *NLRB v. Ingredion Inc.*, 930 F.3d 509, 514 (D.C. Cir. 2019) (citation omitted). "The substantiality of

---

[1] The Board also affirmed the ALJ's conclusions that Xcel violated § 8(a)(1) "[b]y telling employees they will no longer be allowed to go home early" in violation of a collective bargaining agreement; and violated § 8(a)(5) by refusing to give the Union information in a timely manner. ALJ Op. 60; Board Op. 1 n.1. Xcel does not challenge those aspects of the Board's order in its briefing before us, so we summarily enforce those parts of the Board's decision. *See Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1088–89 (D.C. Cir. 2016) ("Because the Board is entitled to enforcement of all unchallenged portions of its order, we summarily enforce all such provisions of the Board's decision." (cleaned up)).

3

evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

## III.

### A.

We begin with our own jurisdiction. Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). This provision limits our jurisdiction to those "objections made before the Board [that] were adequate to put the Board on notice that the issue might be pursued on appeal." *United Food and Commercial Workers Union, Local 400 v. NLRB*, 989 F.3d 1034, 1037 (D.C. Cir. 2021) (quoting *Consol. Freightways v. NLRB*, 669 F.2d 790, 794 (D.C. Cir. 1981)).

Xcel raises three arguments in its petition for review that it did not urge before the Board. Specifically, Xcel argues that Salopek's conduct was not protected under the Act because: (1) Salopek's actions were not for "mutual aid or protection" of Xcel's employees, *see* Pet'r's Br. 25–28; (2) Salopek did not put the Navy on notice of "an ongoing labor dispute" between the employees and Xcel, *see id*. at 28–31; *Am. Golf Corp.*, 330 N.L.R.B. 1238, 1240 (2000) (*Mountain Shadows*); and (3) Salopek's allegations were "sufficiently disloyal" as to "lose the protection of the Act," *see Mountain Shadows*, 330 N.L.R.B. at 1240; Pet'r's Br. 33.

Xcel does not contest that it failed to specifically raise those issues in its exceptions or briefing before the Board. Instead, Xcel asserts that it raised the mutual-aid and labor-dispute arguments "generally in the [e]xceptions it filed" to the ALJ's decision. Pet'r's Br. 25. But exceptions must be specific enough to put the Board "on notice that the issue might be pursued on appeal." *United Food*, 989 F.3d at 1037 (citation omitted). General objections do not clear that bar. *See Spectrum Health-Kent Cmty. Campus v. NLRB*, 647 F.3d 341, 348–50 (D.C. Cir. 2011). To the extent that Xcel makes an independent argument that Salopek was "flagrantly disloyal," *see* Pet'r's Br. 33; Pet'r's Reply Br. 9–10, Xcel also failed to specifically raise that issue before the Board, *see* Pet'r's Reply Br. 10 (asserting only that Xcel's disloyalty "argument was *generally* raised before the Board" (emphasis added)). Xcel's exceptions to the ALJ's decision never mention the word "disloyal" or any variation of it, and the company's brief before the Board uses the word only in a passing quotation of the ALJ's decision. *See* Xcel Exceptions 1–7; Br. in Supp. of Exceptions 44.

Xcel also suggests that its mutual-aid and labor-dispute arguments are properly before the court because a dissenting Board member raised those issues. *See* Pet'r's Br. 25. But "[a] dissenting member's discussion of an issue is not enough" to satisfy § 10(e). *United Food*, 989 F.3d at 1037; *accord HTH Corp. v. NLRB*, 823 F.3d 668, 673 (D.C. Cir. 2016) ("[A] party may not rely on arguments raised in a dissent [from the Board's decision] or on a discussion of the relevant issues by the majority to overcome the § 10(e) bar; the Act requires the party to raise its challenges itself."). Thus, we lack jurisdiction to consider the arguments that Xcel neglected to put before the Board.

4

B.

Xcel argues that the Board erroneously rejected its contention that Salopek's "maliciously untrue" statements about the company justified his termination. The NLRA protects "efforts by employees 'to improve terms and conditions of employment' through appeals to third parties standing 'outside the immediate employee-employer relationship.'" *DirecTV, Inc. v. NLRB*, 837 F.3d 25, 33 (D.C. Cir. 2016) (quoting *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978)). An employer may nevertheless discharge an employee if the employee's communication to a third party: (i) fails to "indicate[] it is related to an ongoing dispute between the employees and the employers"; or (ii) is "so disloyal, reckless[,] or maliciously untrue as to lose the Act's protection." *Id.* at 34 (quoting *Mountain Shadows*, 330 N.L.R.B. at 1240); *see also NLRB v. Local Union No. 1229, IBEW*, 346 U.S. 464 (1953) (*Jefferson Standard*). "The mere fact that statements are false, misleading[,] or inaccurate is insufficient to demonstrate that they are maliciously untrue." *Valley Hosp. Med. Ctr., Inc.*, 351 N.L.R.B. 1250, 1252 (2007). "Such statements may be 'untrue,' but they would not be 'maliciously untrue.'" *DirecTV*, 837 F.3d at 41. Rather, maliciously untrue statements "must be made with knowledge of their falsity or with reckless disregard for their truth or falsity." *Id.* (cleaned up).

Here, substantial evidence supports the Board's conclusion that "the core issues Salopek raised with Navy leadership were true." Board Op. 4 n.8. Take Salopek's statements that "qualifications at a gravel pit range had occurred on 'several occasions'" and that Xcel employees altered targets so that guards could qualify. Pet'r's Br. 34. Terry testified before the ALJ that Xcel "had a longstanding practice of using unauthorized locations to qualify guards," and the Xcel employee who allegedly altered the targets "admitted doing so" in a written statement. ALJ Op. 9, 46; *see also* Hr'g Tr. 962–63 (Terry's testimony on unauthorized qualification shoots). To the extent that there were inaccuracies in Salopek's statements, they related to details that did not affect the substance of his concerns — such as the date of an unauthorized qualification shoot. *See* ALJ Op. 24. Such relatively minor discrepancies do not rise to the level of "malicious" untruths.

C.

Xcel's remaining arguments address the Board's application of the *Wright Line* burden-shifting analysis, which governs unlawful termination cases like this one. *See Wright Line*, 251 N.L.R.B. 1083, 1089 (1980). Under *Wright Line*, the General Counsel must first establish a *prima facie* case "(1) that the employee engaged in protected activity; (2) that the employer knew about that activity; and (3) that the protected activity was a motivating factor in the employer's decision to take adverse action." *DHSC, LLC v. NLRB*, 944 F.3d 934, 938 (D.C. Cir. 2019) (cleaned up). If the General Counsel makes her *prima facie* showing, "the employer can rebut this case by showing that it would have taken the same action in the absence of the unlawful motive." *Id.* (cleaned up).

Xcel first contends that the General Counsel did not make a *prima facie* case against Xcel because the agency did not establish that the company acted "with significant animus against Salopek's protected concerted activity." Pet'r's Br. 35–36. But substantial evidence supports the Board's contrary conclusion. *See* Board Op. 3. For instance, Filibeck, Xcel's CEO at the time of Salopek's firing, testified that the company fired Salopek for not raising his concerns "up through

5

the appropriate military chain of command" and instead "barg[ing] into the commanding officer's offices . . . [which] reflects very badly on the employees and on the company as a whole." Hr'g Tr. 1021–22. This is effectively a concession that Xcel fired Salopek for engaging in the protected activity of meeting with the base commander to report safety concerns.

Xcel next argues that it fired Salopek not because he raised safety concerns to the Navy, but because he violated the Navy's "chain of command." Pet'r's Br. 36. But no credible evidence showed that the Navy required Xcel employees to submit such concerns in any particular manner; indeed, the base commander "seemed to welcome their complaints." ALJ Op. 50 n.38.

Finally, at the second stage of the *Wright Line* analysis, Xcel contends that it "would have terminated Mark Salopek, even absent his alleged protected concerted activities." Pet'r's Br. 38 (capitalization removed). The company claims it would have done so because of Salopek's asserted dishonesty and on the basis of Rake's report. *See id*. at 38–41. But Salopek's asserted dishonesty provides no legitimate basis for his removal because, as we have discussed, the Board properly concluded that his core allegations were true. Nor can Xcel rely on Rake's report to justify Salopek's termination, because Rake did not recommend that action. *See* ALJ Op. 37, 53; Hr'g Tr. 558:22–25 (Rake: "[I]t's drilled into us; we cannot . . . fire a contractor.").

For the foregoing reasons, we deny Xcel's petition for review and grant the Board's cross-application for enforcement.

\* \* \*

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or petition for rehearing *en banc*. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a)(1).

**<u>Per Curiam</u>**

FOR THE COURT:
Mark J. Langer, Clerk

BY: /s/
Daniel J. Reidy
Deputy Clerk

6